STATE of Minnesota, Respondent,

v.

Akeem PENDLETON, petitioner, Appellant.

No. C6–95–2162.

Supreme Court of Minnesota.

Aug. 7, 1997.

Lawrence Pry, Assistant Public Defender, St. Paul, for Appellant.

Michael Richardson, Assistant Hennepin County Attorney, Minneapolis, for Respondent.

## OPINION

GARDEBRING, Justice.

This case presents the issue of whether the standard jury instructions for "defense of dwelling," given in this case, improperly require that the defendant must have feared great bodily harm or death to justify his use of deadly force in defending his home.

Akeem Pendleton was charged with attempted second-degree murder, Minn.Stat. § 609.17 (1996), Minn.Stat. § 609.19(1) (1992) and first- and second-degree assault, Minn. Stat. §§ 609.221 and 609.222, subd. 2 (1996), in the December 10, 1994 shooting of Tony Caine. At trial, Pendleton claimed the shooting was in self defense, or in the alternative, in defense of his home. He requested that the standard jury instructions on self defense be modified to make clear that the fear of great bodily harm or death required for a self defense claim was not an element of a claim of "defense of dwelling." The trial court refused, and gave the standard jury instructions, which include the fear of great bodily harm or death element for both "defense of dwelling" and self defense. The jury returned a verdict of guilty on the first- and second-degree assault charges and not guilty on the attempted second-degree murder charge.

Pendleton appealed to the court of appeals, which affirmed, holding that the jury instructions accurately reflected "the current law of self defense in Minnesota." In addition, the

court of appeals concluded that even if the instructions were in error, the inclusion of the fear of great bodily harm or death element for "defense of dwelling" did not have a significant impact on the verdict and therefore, did not require a new trial. We reverse and remand for a new trial.

In December 1994, the defendant Akeem Pendleton and his fiance Lorraine Wilson were living with Wilson's children in a duplex in Minneapolis. On December 10, a Saturday, at about 5:00 p.m., Wilson's cousin Tony Caine came to the apartment to visit. When Caine arrived, Pendleton let him in. Also present in the apartment were Doug Buckanaga, a friend of Pendleton's from work, and Buckanaga's girlfriend, Angela Bellanger. Pendleton, Buckanaga and Bellanger were socializing in the kitchen while Pendleton prepared a meal. Caine and Wilson were talking to each other at the dining room table.

Wilson testified that she had been having conflicts with her family over various issues, including her relationship with Pendleton and her family's expectation of financial and other support from her. Earlier on the day of the crime, she had asked Caine not to come to her home anymore. On the evening in question, she and Caine were arguing about these problems, as well as Wilson's complaints that Caine took money from her and used her telephone. She described their argument as becoming heated. She eventually got up from the table and went into the bathroom.

At that point, Caine went into the kitchen looking for Pendleton. According to Buckanaga's testimony, Caine made a comment to Pendleton about his needing to keep his fiance in line and shoved Pendleton. Caine then punched Pendleton in the face a couple of times causing Pendleton to bleed beneath his eye. Pendleton started to fight back, but Buckanaga interfered and pulled Pendleton away. At the time Caine started hitting him, Pendleton had a knife in his hand, which he had been using in his cooking. Buckanaga took this knife away and set it down. Pendleton then went into the bathroom to clean the blood off his face.

According to testimony at the trial, Pendleton came out of the bathroom and asked Caine to leave. By this time, they were both standing in the front room, as were Buckanaga and Wilson. Caine refused to leave the apartment and tried to hit Pendleton again. Pendleton jumped up and grabbed a shotgun out of the ceiling tiles. As Pendleton was taking the gun out of its case, he kept telling Caine to leave. Caine rushed at Pendleton, they struggled with the gun, and Pendleton shot Caine in the shoulder. The struggle continued until Pendleton wriggled free, ran, and drove away with Buckanaga and Bellanger in Buckanaga's truck.

Pendleton and his fiance Wilson both testified that when Caine lunged at Pendleton in the front room, Caine had a knife in his hand. Buckanaga, who was standing in the same room, testified that he never saw Caine with a knife, although he did say that immediately before Caine lunged at Pendleton, Caine was standing with his hand behind his back. The police did find a knife at the scene, but did not seize it, so it was never tested for fingerprints. In his testimony, Caine denied attacking Pendleton and claimed instead that Pendleton had started the fighting.

At trial, Pendleton argued that he acted in self defense because Caine lunged at him with a knife. In the alternative, he argued that he acted to prevent the commission of a felony, either second- or third-degree assault, in his home.[1]

The following jury instructions were given on these defenses:

> No crime is committed when a person attempts to take the life of another person, even intentionally if defendant's action is taken in resisting or preventing an offense which defendant reasonably believes exposes defendant or another to death or great bodily harm, if defendant's action is taken in preventing the commission of the

---

1. Second-degree assault is assault with a dangerous weapon, Minn.Stat. § 609.222 (1996), and third degree assault is assault resulting in substantial bodily harm, Minn.Stat. § 609.223 (1996). Great bodily harm is more severe than substantial bodily harm. Minn.Stat. § 609.02, subds. 7a & 8 (1996).

felony of Assault in the Second Degree or Assault in the Third Degree in defendant's place of abode.

In order for a killing to be justified for these reasons three conditions must be met. First, defendant's action must have been done in the belief that it was necessary to avert death or great bodily harm. Second, the judgment of defendant as to the gravity of the peril to which he or another was exposed must have been reasonable under the circumstances. Third, defendant's election to defend must have been such as a reasonable person would have made in light of the danger perceived and the existence of any alternative way of avoiding the peril. All three conditions must be met, but the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

These instructions follow the model jury instructions for self defense, causing death. *See* 10 Minn. Dist. Judges Ass'n, Minnesota Practice, CRIMJIG 7.05 (3d ed. 1990) ("CRIMJIG 7.05").

■ On appeal to this court, Pendleton again argues that he is entitled to a new trial because the jury instructions on "defense of dwelling" were "inaccurate and misleading." In general, the trial court has considerable latitude in the selection of the language of a jury charge. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn.1986). Nevertheless, a jury instruction must not materially misstate the law. *See State v. Turnipseed,* 297 N.W.2d 308, 312 (Minn.1980).

We must first establish the statutory elements of "defense of dwelling," in order to decide whether the jury instruction given in this case misstated the law. The use of force is statutorily authorized only in certain situations:

[R]easonable force may be used upon or toward the person of another without the other's consent when the following circumstances exist or the actor reasonably believes them to exist:

\* \* \* \*

(3) when used by any person in resisting or aiding another to resist an offense against the person; or

(4) when used by any person in lawful possession of real or personal property, or by another assisting the person in lawful possession, in resisting a trespass upon or other unlawful interference with such property \* \* \*.

Minn.Stat. § 609.06, subd. 1 (1996). This provision is modified by another provision entitled "Justifiable Taking of Life."

The intentional taking of a life of another is not authorized by section 609.06, except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode.

Minn.Stat. § 609.065 (1996).

■ Taken together, these provisions establish that reasonable force may be used when a person reasonably believes that he or she is resisting an offense against a person or a trespass upon lawfully held property. This "reasonable force" includes deadly force only when the offense against a person involves great bodily harm or death or is used to prevent the commission of a felony in one's home.

■ Based on the language of the statute itself, it is clear that one does *not* have to fear great bodily harm or death to justify the use of deadly force to defend against the commission of a felony in one's home. The language of the statute requiring fear of great bodily harm or death is contained in the clause relating to self defense. In contrast, the "defense of dwelling" clause simply states that deadly force is justified in "preventing the commission of a felony in the actor's place of abode." Minn.Stat. § 609.065.

The legislative history of section 609.065 supports our reading of this provision. Prior to the 1963 revision of the criminal code, Minnesota statutes allowed for a defense of dwelling to resist a felony, without requiring any fear of bodily injury. The statute stated that homicide was justified when committed "[i]n the actual resistance of an attempt to commit a felony upon the slayer, in his presence, *or upon or in a dwelling or other place*

*of abode in which he is."* Minn.Stat. § 619.29(2) (1961) (emphasis added); *see also State v. Touri,* 101 Minn. 370, 372–73, 112 N.W. 422, 423 (1907) (approving jury instruction which stated killing was justified if done "in the actual resistance of an attempt to commit a felony upon or in the dwelling or place of abode").

The 1963 Advisory Committee on the redrafting of the statute recommended abolishing the "defense of dwelling" justification for the taking of life, but the legislature rejected such advice and on its own initiative added the current language, "or preventing the commission of a felony in the actor's place of abode." Minn.Stat. Ann. § 609.065 advisory committee cmt. & cmt. of Maynard E. Pirsig (West 1987). Thus, it is clear that the legislature specifically chose to include a defense to criminal charges based solely on the protection of one's home.

Our interpretation is further buttressed by the rules of construction that guide our analysis of statutory provisions. Specifically, we are directed to presume that the legislature intended the entire statute to be effective and certain. Minn.Stat. § 645.17(2) (1996). If we were to construe "defense of dwelling" to require a fear of great bodily harm or death, we would effectively be eliminating the defense, because it would then be synonymous with self defense; the only difference between the two as stated in section 609.065 is the "fear of great bodily harm or death" element present only in the definition of self defense. Because the legislature specifically included a separate definition of "defense of dwelling"—and omitted any fear of great bodily harm or death language for that defense—it presumably intended that language to be meaningful. Therefore, based upon the plain meaning of the statute, its legislative history and the canons of statutory construction, we hold that "fear of great bodily harm or death" is not an element of "defense of dwelling."

We must next determine whether the jury instructions given in this matter materially misstated the law of "defense of dwelling." While the specific language of jury instructions may vary from case to case, they may not materially misstate the law. *Turnipseed,* 297 N.W.2d at 312.

The trial court in this matter gave the model jury instructions for self defense. *See* CRIMJIG 7.05. These standard instructions include the specific language from section 609.065 and then add additional language from this court's decision in *State v. Boyce,* 284 Minn. 242, 253, 170 N.W.2d 104, 112 (1969). There, relying on Minn.Stat. §§ 609.06 and 609.065, this court required that, in order to justify a killing in *self defense,* the evidence must support the affirmative answers to the following questions:

(1) At the time defendant shot [the victim], was defendant resisting or preventing an offense which he believed exposed him to great bodily harm or death?

(2) Was this belief reasonable under the circumstances?

(3) Was the intentional killing of [the victim] a reasonable exertion of force under the circumstances then existing in light of the danger then to be apprehended?

*Id.* However, the only defense at issue in *Boyce* was self defense, not "defense of dwelling."[2] Because defense of dwelling was not at issue in *Boyce,* the case simply does not stand for the proposition that fear of great bodily harm or death is an element of "defense of dwelling."[3]

---

**2.** In *Boyce,* the defendant, the decedent and another man, who were all neighbors, had been feuding over issues regarding their properties and parking for several years. 284 Minn. at 246–248, 170 N.W.2d at 108–109. On the day of the shooting, the three got into a verbal fight. The two other men ganged up on the defendant, threatening to kill him, and followed him through the alley to the front of the four-plex where the defendant lived, and which he owned. In the front yard of the four-plex, the defendant shot and killed the decedent. *Id.* at 248–253, 170 N.W.2d at 109–111. The killing did not

occur in the defendant's home and "defense of dwelling" was not raised or considered.

**3.** While we have cited CRIMJIG 7.05 and the use of the *Boyce* factors with approval in self defense cases in which the killing took place in the defendant's home, we have never held that those factors apply in a "defense of dwelling" situation, because that defense was not at issue in those cases. *See State v. Sanders,* 376 N.W.2d 196, 200–201 (Minn.1985); *State v. Housley,* 322 N.W.2d 746, 750 (Minn.1982). In *Sanders,* "defense of dwelling" was not alleged by the defen-

■ Because the jury instructions given in this case required the defendant to show he feared great bodily harm or death to justify his use of deadly force to prevent the commission of a felony in his home, in contradiction of the plain language of section 609.065, those jury instructions materially misstated the law, and were therefore in error.

■ However, though erroneous, the mistaken instructions may not require a new trial in this matter, if the error was harmless. An error in jury instructions is not harmless and a new trial should be granted if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict. *State v. Olson*, 482 N.W.2d 212, 216 (Minn.1992). We must first consider whether Pendleton was actually entitled to an instruction on "defense of dwelling," since any error in the instructions would, of course, be harmless if Pendleton were simply not entitled to it. A defendant is entitled to an instruction on his theory of the case if there is evidence to support it. *State v. Ruud*, 259 N.W.2d 567, 578 (Minn.1977). Evidence to support Pendleton's assertion of the "defense of dwelling" claim would be necessary in three categories:

(1) At the time the defendant used deadly force against the victim, was the defendant preventing the commission of a felony in his or her home?

(2) Was the belief reasonable under the circumstances?

(3) Was the use of deadly force reasonable under the circumstances in light of the danger then to be apprehended?

These factors are, of course, a recasting of the *Boyce* factors in the context of a "defense of dwelling" claim. They restate the statutory requisite that deadly force be both neces-

sary and reasonable, along with the requirement that it be used to prevent a felony in one's home. Our analysis then turns to considering whether there was evidence relating to these three factors.

■ There is no dispute that the incident occurred within Pendleton's home, and there was evidence that would support the conclusion that Pendleton reasonably feared a felony, either second- or third-degree assault. Buckanaga, Pendleton and Wilson all testified that there was a struggle immediately preceding the shooting, and that Caine was the aggressor. While the three differed on whether Caine was threatening Pendleton with a knife, the use of a weapon is not necessary for Pendleton to have feared the felony of third-degree assault. Finally, there was evidence that would support a conclusion that Pendleton's use of force was reasonable. In his taped statement to police, which was played to the jury, Pendleton indicated that he intended only to frighten Caine with the gun, but when that did not work, he shot Caine in the shoulder. In addition, the jury here was persuaded that Pendleton did not intend to kill Caine because it acquitted him on the attempted second-degree murder charge.

Based upon our consideration of this evidence in the record, we conclude that Pendleton was entitled to a "defense of dwelling" instruction that properly stated the law, and that the error here, requiring the jury to find Pendleton had a fear of death or great bodily harm in order to find that he acted to defend his dwelling, effectively denied Pendleton such instruction.[4] The court instructed the jury that Pendleton would be not guilty if he acted to prevent the commission of second- or third-degree assault in his home, *and* if he feared death or great bodily harm. Neither

dant at all. 376 N.W.2d at 199. In *Housley,* the defendant did plead "defense of dwelling" as well as self defense, but we reversed the defendant's conviction based on our conclusion that the defendant had acted in self defense. 322 N.W.2d at 750–51. Thus, the allegation by the defendant that he acted to defend his home was superfluous in light of our conclusion that he was entitled to self defense—it was an alternative argument that was never considered in the disposition of the case on self defense grounds.

4. The state argues that because Pendleton asserted *both* self defense and "defense of dwelling," any error in the jury instructions was harmless. It is not clear how the state reaches this conclusion, however, because these are distinct, albeit similar, defenses. Moreover, the state essentially concedes that the jury instructions as given misstated the "defense of dwelling," concluding that the error would not have been harmless if *only* "defense of dwelling" were claimed.

second nor third-degree assault, however, involves the infliction of great bodily harm. Thus, even if the jury believed that Pendleton feared second- or third-degree assault, under the trial court's instructions, it could not have reached the final conclusion that he had acted in "defense of dwelling," as defined in section 609.065.

■ In summary, a defendant asserting "defense of dwelling" is not required to show that he or she feared death or great bodily harm to justify the use of deadly force in preventing the commission of a felony in the defendant's place of abode. Minn.Stat. § 609.065. The jury instructions given in this case, and the standard jury instruction CRIMJIG 7.05, erroneously included the fear of great bodily harm or death element, and effectively eliminated "defense of dwelling" from the jury's consideration. Because there was evidence presented here to support Pendleton's theory that he acted to prevent the commission of a felony in his home, he was entitled to a separate and proper instruction on "defense of dwelling," and the trial court's failure to provide such an instruction was not harmless.

Reversed and remanded for a new trial.