STATE of Minnesota, Respondent,

v.

Eli (NMN) HARE, Jr., petitioner,
Appellant.

No. CX–96–1672.

Supreme Court of Minnesota.

March 5, 1998.

John M. Stuart, Minnesota State Public
Defender by Ann McCaughan, Assistant

State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, Michael O. Freeman, Hennepin County Attorney by Donna J. Wolfson, Assistant County Attorney, Minneapolis, for Respondent.

## OPINION

PAGE, Justice.

The defendant, Eli Hare, Jr., was charged with one count of intentional murder in the second degree in violation of Minn.Stat. § 609.19(1) (1996) and one count of felony murder in the second degree in violation of Minn.Stat. § 609.19(2) (1996) for the stabbing death of Roosevelt Cooper on December 22, 1995. At trial, Hare claimed that he did not intend to kill Cooper when he stabbed him and that his actions were taken in self-defense and in defense of his dwelling. Accordingly, Hare requested that the trial court give the general self-defense instruction in CRIMJIG 7.06 or, in the alternative, that the court modify CRIMJIG 7.05 to fit the circumstances of an accidental death. The court refused Hare's request and gave CRIMJIG 7.05 unmodified. The court also gave a defense of dwelling instruction which indicated that, in order for the defense to apply, Hare had to be in fear of death or great bodily harm at the time of his actions.

The jury rejected Hare's claims of self-defense and defense of dwelling and convicted him of second-degree felony murder. Hare appealed his conviction to the court of appeals, claiming that there was insufficient evidence to support his conviction, the trial court erred by giving misleading jury instructions, and the trial court abused its discretion in failing to impose a downward sentencing departure. The court of appeals

affirmed in an unpublished decision. Hare appeals to this court, claiming that he is entitled to a new trial based on this court's recent decision in State v. Pendleton, 567 N.W.2d 265 (Minn.1997). In Pendleton, we held that fear of death or great bodily harm was not an element of the "defense of dwelling" defense. In addition, Hare, in his brief to this court, appears to reassert his argument that the trial court gave erroneous and misleading jury instructions with respect to his claim of self-defense.[1] We affirm.

In February of 1995, Dorris Morris and her 10–year–old son moved into a small apartment[2] in Minneapolis with her boyfriend, Roosevelt Cooper, whom Morris had been dating for 4 or 5 years. Cooper had been living at this location for 4 years. It was not uncommon for Morris and Cooper to have arguments, which occasionally turned physical.

In September of 1995, Morris's 52–year–old uncle, Eli Hare, needed a place to stay after completing a treatment program and was permitted to move in with Morris and Cooper. Hare paid rent, and, in return, was given a room which he described as a small, uninsulated storage space. The only access to this space was through the bathroom.

On December 22, 1995, a dispute arose between Hare and Cooper which ultimately resulted in Cooper's death. At trial, Hare gave the following version of the events leading to Cooper's death. Hare was at home on the evening of December 22, sharing a half-pint of gin with a brother of his who had stopped by to discuss an upcoming trip to Arkansas. Hare's brother left and, within a short time, Hare's nephew, Henry Richardson, and Richardson's girlfriend, Tammy Jiles, stopped by for a visit. Cooper was also present. Morris arrived home at about 8:00 p.m. and found Hare, Cooper, Richardson, and Jiles all drinking beer.

---

**1.** We use the phrase "appears to reassert" because, at oral argument, both parties contended that the sole issue raised in this appeal is whether this court should reverse based on our holding in Pendleton. However, our review of both Hare's petition for further review and his brief to this court satisfies us that the issue regarding CRIMJIG 7.05 and CRIMJIG 7.06 was sufficiently raised in this court.

**2.** The apartment took up the third floor of a 3–story home. The record indicates it contained a bedroom, a living room, a kitchen, a short hallway, a small storage space, and a back porch. All of the rooms are quite small and close to one another.

Shortly after Morris's arrival, Hare and Richardson were sitting in the living room talking with Cooper, who was sitting at the kitchen table with Morris, when an argument began between Morris and Cooper. The argument escalated, and Cooper, who was 5 feet 9 inches tall and weighed 139 pounds, charged at Morris. Morris, who is 5 feet 2 inches tall and weighed approximately 175 pounds, picked Cooper up and threw him down on a coffee table in the living room. Morris and Cooper then started "tussling" with each other. At that point, Hare, who is about 6 feet tall and weighed approximately 230 pounds, intervened and began punching Cooper. Hare testified that he was trying to protect Morris. Morris, however, tried to push Hare away, insisting that she could handle her own affairs. Richardson and Jiles intervened and forced Hare into a chair. As a result, things seemed to calm down for a moment though, according to Hare, he and Cooper continued to shout at each other.

Cooper proceeded to call 911, but Morris hung up the phone. The 911 operator called back, and Cooper said he wanted the police to come and get people out of his house. The operator could hear screaming in the background and dispatched the police.

Cooper then got a broom from the kitchen, hit Hare in the head with it, and threatened to kill him. Morris, Richardson, and Jiles separated them. Cooper next got a knife and told Hare to get out of his house. As this was happening, Richardson and Jiles were holding Hare down. Hare screamed at them to stop Cooper before Cooper killed him. Morris grabbed Cooper and pushed him through the kitchen onto the back porch. Richardson and Jiles continued to restrain Hare in the living room and Morris, from the back porch, pleaded with Hare to leave. Hare said he would leave after he got his coat out of his room. Hare got up from the couch and proceeded to his room.

While looking for his coat, which he was having trouble finding because the light in the room was broken, Hare heard noise and breaking glass coming from the back porch. Hare, wanting to see what was going on, left his room, peered through a window, and saw Cooper and Morris struggling on the porch. Morris saw Hare and again told him to leave. Hare returned to his room to find his coat.

After hearing more glass breaking and loud noise, Hare again went to see what was going on. He saw Cooper pushing his way into the kitchen as Morris struggled to hold him back. Once inside, Cooper, who still had the knife in his hand, shouted at Hare that it was not over yet and that he was going to kill Hare. At the time, Morris was holding Cooper and Cooper's hands were at his sides.

Hare, fearing for his life, picked up a knife that was in the bathroom and rushed at Cooper. According to Hare, he intended to stab Cooper in the arm to make him drop his knife. Hare's plan was thwarted when Jiles warned Morris that Hare had a knife. This caused Morris, who was still holding Cooper, to move, and, instead of stabbing Cooper in the arm, Hare stabbed Cooper in the neck, killing him.

Morris also testified at trial. According to her testimony, after Hare and Cooper were separated the first time, Cooper picked up a broom, started swinging it, and asked everyone to leave. She testified, however, that no one was around Cooper when he was swinging the broom and that she quickly took the broom from him. Then Cooper got a knife from the kitchen and started swinging it as he entered the living room. Morris testified that at this point, she, Richardson, and Jiles were holding Hare down in the living room. She kept telling Hare that Cooper was not going to kill him and that Cooper just wanted him to leave. Morris also testified that, as Cooper was headed toward Hare with the knife, Cooper said that "he knowed [sic] it wouldn't be over as long as [Hare] was there." It was at this point that Morris pulled Cooper to the back porch where they continued to "tussle." Morris continued to tell Hare to leave, but he did not say anything in response.

Cooper still had the knife in his hand when, at some point, he and Morris re-entered the kitchen. Morris was holding Cooper's hands at his side, still trying to control him, when she heard Jiles warn her that Hare had a knife. Morris turned around at the same time Hare reached out with the knife and stabbed Cooper in the neck. At the time of the stabbing, it appeared to Morris that Hare was running toward Cooper and that Cooper was making movements toward Hare.

Jiles also testified and, while her testimony was generally consistent with that of Morris and Hare, there were discrepancies. Jiles testified that when Hare intervened in the dispute between Morris and Cooper, he kicked Cooper in the groin. She also testified that she saw Hare pull Morris's head out of the way when he stabbed Cooper in the neck. Finally, she testified that after the stabbing, Hare kicked Cooper as he laid on the floor.

The police officers, who had been dispatched after the 911 call, arrived shortly after the stabbing. One of the officers asked who had the knife and who stabbed Cooper. Hare raised his hand in the air and stated, "I did it." Hare was handcuffed and eventually placed in a squad car. While sitting in the squad car, Hare told one of the officers that he was protecting himself from Cooper who also had a knife. Cooper had a blood alcohol content of .14 at the time of his death. Hare's blood alcohol, measured some two hours after the stabbing, was .22.

■ We first address Hare's claim that the trial court erred by giving the jury an improper instruction with respect to his defense of dwelling defense. The trial court gave the following version of the standard jury instruction for self-defense contained in CRIMJIG 7.05, Self-Defense—Causing Death:

> No crime is committed when a person takes the life of another person, even intentionally,
> ■ if defendant's action is taken in resisting or preventing an offense which defendant reasonably believes exposes defendant *to death or great bodily harm*, or
> ■ if defendant's action is taken in preventing the commission of the felony

3. Because Hare claimed that he intended to act in self-defense, but did not intend to kill Cooper, the court read the words "defendant's action" and not "the killing."

4. Minnesota Statutes sections 609.06 and 609.065 provide in relevant part:

> Except as otherwise provided in subdivision 2, reasonable force may be used upon or toward the person of another without the other's con-

of assault in defendant's place of abode.

In order for a killing to be justified for these reasons three conditions must be met. First, defendant's action[3] must have been done in the belief that it was *necessary to avert death or great bodily harm*. Second, the judgment of defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances. Third, defendant's election to defend must have been such as a reasonable person would have made in light of the danger perceived and the existence of any alternative way of avoiding the peril. All three conditions must be met, but the state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

*See* 10 Minn. Dist. Judges Ass'n, Minnesota Practice, CRIMJIG 7.05 (3d ed. Supp.1997) (emphasis added).

Hare argues that this jury instruction was improper because the defense of "defense of dwelling" applies in this case and that defense does not require the actor to be in fear of death or great bodily harm. In support of this argument, Hare relies on this court's decision in *State v. Pendleton* which held:

> [A] defendant asserting "defense of dwelling" is not required to show that he or she feared death or great bodily harm to justify the use of deadly force in preventing the commission of a felony in the defendant's place of abode.

*Pendleton*, 567 N.W.2d 265, 271 (Minn.1997).

In so holding, we reasoned that Minn.Stat. § 609.06, which authorizes use of reasonable force in self-defense, and Minn.Stat. § 609.065,[4] which allows the justifiable taking of a life in self-defense, when read together:

> [E]stablish that reasonable force may be used when a person reasonably believes

sent when the following circumstances exist or the actor reasonably believes them to exist:
&#42; &#42; &#42; &#42;
(3) when used by any person in resisting or aiding another to resist an offense against the person; or
(4) when used by any person in lawful possession of real or personal property, or by another assisting the person in lawful possession, in resisting a trespass upon or other unlawful interference with such property;

that he or she is resisting an offense against a person or a trespass upon lawfully held property. This "reasonable force" includes deadly force only when the offense against a person involves great bodily harm or death or is used to prevent the commission of a felony in one's home.

Based on the language of the statute itself, it is clear that one does *not* have to fear great bodily harm or death to justify the use of deadly force to defend against the commission of a felony in one's home.

*Pendleton,* 567 N.W.2d at 268 (emphasis in original).

While Hare correctly states our holding and rationale in *Pendleton, Pendleton* is of no assistance to Hare. The defendant's actions in *Pendleton* occurred when the victim, who was visiting the home of the defendant, refused to leave. At the time of the defendant's actions, the victim had *no right* to be in the defendant's home. In contrast, Hare and Cooper were residents of the same dwelling. This distinction is critical. The historical basis for the defense of dwelling defense is rooted in the concept that "a man's home is his castle." *See* F. Inbau, A. Moenssens & R. Thompson, *Cases and Comments on Criminal Law,* 209 (4th ed.1987).

Defense of habitation stems from the law's early castle doctrine; defense of the home is considered equivalent to defense of life itself. Under this privilege, to prevent *a forcible intrusion,* a lawful resident is permitted to use deadly force against an *intruder* who the resident reasonably believes intends to commit a felony or inflict serious bodily harm imminently upon any-

one in the residence, provided necessity or apparent necessity is present.

*Privileges For the Use of Deadly Force Against a Residence–Intruder: A Comparison of the Jewish Law and the United States Common Law,* J. David Jacobs, 63 Temp. L.Rev. 31, 46 (1990) (emphasis added) (citing, *id.*). Implicit in the defense of dwelling defense is the notion that the dwelling is being defended against an intruder.

■ An unlawful invasion into the home is also contemplated by Minnesota's law on "defense of dwelling." *See supra* at n. 4. Minnesota Statutes section 609.06 permits the use of reasonable force in self-defense "[w]hen used by any person in lawful possession of real or personal property, * * * in resisting a *trespass* upon * * * such property." Minn.Stat. § 609.06, subd. 1(4) (emphasis added). When this language is read in conjunction with Minn.Stat. § 609.065, it is clear that the defense of dwelling defense anticipates an unauthorized intrusion into the defendant's dwelling. Necessarily, when the defendant and the victim reside in the same dwelling, the defendant cannot raise the defense of dwelling defense.

Hare was not defending his home against an intruder. This case involves a dispute between two people who were residents of the same dwelling at the time the altercation arose. Hare did not have a legitimate defense of dwelling claim and any error in jury instructions regarding such defense was harmless.

■ We now turn to Hare's second argument. At trial, Hare requested that the trial court instruct the jury using CRIMJIG 7.06[5] or a carefully modified CRIMJIG 7.05.

Minn.Stat. § 609.06 (1996).

The intentional taking of the life of another is not authorized by section 609.06, except when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode.

Minn.Stat. § 609.065 (1996).

5. SELF–DEFENSE—DEATH NOT THE RESULT

Defendant is not guilty of a crime, if defendant used reasonable force against _____ to resist (or to aid _____ in resisting) an offense against the person, and such defense was being

committed or defendant reasonably believed that it was.

It is lawful for a person who is being assaulted and who has reasonable grounds to believe that bodily injury is about to be inflicted upon the person, to defend from such attack, and in doing so the person may use all force and means which the person believes to be reasonably necessary and which would appear to a reasonable person, in similar circumstances to be necessary to prevent the injury which appears to be imminent.

The kind and degree of force which a person may lawfully use in self-defense is limited by what a reasonable person in the same situation would believe to be necessary. Any use of force beyond that is regarded by the law as excessive.

The trial court denied this request and instructed the jury using an unmodified CRIMJIG 7.05. Hare claims the trial court's use of CRIMJIG 7.05 was inaccurate and misleading and that, because the error was not harmless, he is entitled to a new trial. Generally, trial courts have broad discretion in selecting the language of jury instructions. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn. 1986). However, when instructing on self-defense, courts must use "analytic precision." *State v. Sanders,* 376 N.W.2d 196, 201 (Minn. 1985) (citing *State v. Edwards,* 343 N.W.2d 269, 277 (Minn.1984)). Further, jury instructions must not materially misstate the law. *See State v. Turnipseed,* 297 N.W.2d 308, 312 (Minn.1980).

■ Hare contends that the trial court should have given CRIMJIG 7.06 in this case because he claimed that Cooper's death was accidental. This contention has merit. We have repeatedly cautioned trial courts that when a defendant, asserting self-defense, claims that the resulting death was unintentional, CRIMJIG 7.05 is inappropriate and that CRIMJIG 7.06 is likely to better fit the facts of the case.[6] For example, in *State v. Edwards,* this court noted that "[CRIMJIG 7.05] is useful only when the death was intended. * * * When a defendant claims that he pointed a gun in self-defense but that the shooting was accidental, CRIMJIG 7.05 clearly does not fit." 343 N.W.2d 269, 277 (Minn.1984). Likewise, in *State v. Marquardt,* this court made it clear that if a defendant claims that he intentionally stabbed the victim in self-defense but without intending to kill the victim, the language in CRIMJIG 7.05 providing, "the killing must have been done in the belief that * * *" is inappropriate because it implies that the defendant must believe it necessary to kill in order for the killing to be justified.[7] 496 N.W.2d 806, 806 n. 1 (order denying petition for review (Minn.1993), *aff'g State v. Marquardt,* No. C5–92–985, 1993 WL 3860 (Minn. App. Jan. 5, 1993) (unpublished opinion)); *State v. Robinson,* 536 N.W.2d 1, 2–3 (Minn. 1995); *see also State v. Dolbeare,* 511 N.W.2d 443, 446 (Minn.1994) (stating "even where death has resulted from a defendant's action, the judge should use CRIMJIG 7.06 if the defendant's theory does not include a concession that there was an intent to kill."). Our review of the record in this case leads us to the conclusion that there was sufficient evidence before the trial court to entitle Hare to a jury instruction consistent with our holdings in *Edwards, Marquardt, Dolbeare,* and *Robinson.* Therefore, the trial court erred in using CRIMJIG 7.05 to instruct the jury.

■ Despite the trial court's error in this case, however, Hare is not entitled to a new trial if the error was harmless. *See Pendleton,* 567 N.W.2d at 270 (explaining that an error in jury instructions may not require a new trial if the error was harmless). We conclude, on the record before us, that the trial court's error here was harmless. Our conclusion is based on our determination, after a thorough review of the record, that the jury understood that it should acquit Hare if it believed that he acted reasonably when he: failed to leave as requested by Morris and ordered by Cooper; interrupted the search for his coat on two occasions to see what was happening on the back porch; grabbed a knife that was in the bathroom, intending to stab Cooper to make Cooper release the knife Cooper was holding; and stabbed Cooper as he was being restrained by Morris with his arms pinned at his side. *See generally Robinson,* 536 N.W.2d 1. Put

---

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

(The rule of self-defense does not authorize one to seek revenge or to take into his own hands the punishment of an offender.)

10 Minn. Dist. Judges Ass'n, Minnesota Practice, CRIMJIG 7.06 (3d ed. Supp.1997).

**6.** Obviously, when the record before the trial court does not contain evidence from which an inference could be drawn that the death was unintentional, the use of CRIMJIG 7.06 is not required.

**7.** After *Edwards* and again after *Marquardt,* the Committee on Criminal Jury Instruction Guides of the Minnesota District Judges Association, in response to this court's concerns, amended CRIMJIG 7.05. However, the Committee's modifications have not eliminated the problems that arise when CRIMJIG 7.05 is used in cases where the defendant claims the resulting death was unintended. Once again, we instruct that when a homicide defendant asserts self-defense, but claims that the death was unintended, trial courts should not use CRIMJIG 7.05.

another way, as we said in *Marquardt,* "Here, the record fails to support the argument that the giving of the potentially misleading instruction prejudiced defendant." *Marquardt,* 496 N.W.2d at 806.

Affirmed.

GILBERT, J., took no part in consideration or decision of this case.