STATE of Minnesota, petitioner,
Appellant,

v.

Dwight Thomas TRAXLER, Respondent.

No. C8–96–2433.

Supreme Court of Minnesota.

Aug. 6, 1998.

Hubert H. Humphrey III, Attorney General, St. Paul, Thomas J. Harbinson, Scott County Attorney, Susan K. McNellis, Assistant County Attorney, Conrad Skonieczny, Assistant County Attorney, Shakopee, for appellant.

John M. Stuart, State Public Defender, Bradford S. Delapena, Assistant State Public Defender, Minneapolis, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Following a jury trial in Scott County District Court, respondent Dwight Thomas Traxler was convicted of first-degree and a lesser-included fifth-degree controlled substance sale offense in violation of Minn.Stat. §§ 152.021, subd. 1(3) (1996) for the sale of methamphetamine and 152.025, subd. 2(1) (1996) for the possession of methamphetamine. The first-degree controlled substance statute makes it a crime to sell 50 grams or more of methamphetamine within a 90–day period, while the fifth-degree statute simply makes it a crime to possess methamphetamine. The district court sentenced Traxler to the presumptive term of 86 months in prison for the first-degree offense. The court of appeals held that the state failed to prove the weight of the methamphetamine, a required element of the first-degree offense, and reversed Traxler's conviction outright. We hold that the state's evidence was insufficient to prove the weight of the methamphetamine beyond a reasonable doubt. Accordingly, we affirm the court of appeals with respect to the first-degree offense, but we reverse and remand for resentencing on the lesser-included fifth-degree offense.

At approximately 3:00 a.m. on June 27, 1995, undercover narcotics investigator Roger Roatch began surveillance on a five-stall garage in Jordan, Minnesota, at which Roatch suspected Traxler was manufacturing methamphetamine. Roatch was a member of the Southwest Metro Drug Task Force, a multi-agency narcotics investigation organization, which had been conducting an ongoing narcotics investigation of activity at the garage since August 1994. Roatch observed light coming from underneath the overhead doors in front of the garage and light emanating from a window in the back of the garage. Roatch could not see into the garage nor did he observe any other activity until approximately 7:30 a.m. At this time, Roatch saw a blue and gray pickup truck leave the garage driven by a man whom Roatch believed to be Traxler. Roatch followed the truck. Not wanting to stop Traxler himself because he was working undercover, Roatch radioed the Scott County Sheriff's Department for a marked unit to make a traffic stop. On U.S. Highway 169 just north of Belle Plaine, several marked units stopped the truck and Traxler was arrested and taken from the scene on the basis of two outstanding warrants for driving violations and driving without insurance.

Roatch and the remaining officers proceeded to search Traxler's truck. The officers recovered drug paraphernalia used for smoking methamphetamine and marijuana; two white bottles of an over-the-counter product containing the stimulant drug ephedrine; 42 or 43 white coffee filters, some of which contained white residue that Roatch believed to be methamphetamine; and a document

listing items used in the production of methamphetamine.

After Traxler's truck was impounded, Roatch obtained a search warrant of the garage based on the items found in the truck. He searched the garage later that afternoon in cooperation with the Scott County Sheriff's Department and the Federal Drug Enforcement Agency (DEA). During the search, Roatch and DEA Agent Richard Ripley observed many items that confirmed their suspicion that the garage was being used as a methamphetamine lab. Roatch and Ripley sent to the DEA laboratory for testing five representative liquid samples obtained during the search of the garage, coffee filters containing a reddish material, and the coffee filters found in Traxler's pickup truck.

In order to understand the DEA test results, it is necessary to briefly outline the methamphetamine production process. At trial, Gerald Skowronski, a DEA forensic chemist, testified that the production of methamphetamine is generally a four-step procedure. The first step is to extract ephedrine from tablet material. This process involves grinding the tablets, dissolving them in water, pouring the liquid through a filter such as a coffee filter, and then evaporating it to form a solid. The resulting product is pure ephedrine.

Ephedrine is then combined with iodine and red phosphorus during the second step called the "cook." The three solids are cooked over a heated surface and brought to a boil, resulting in a "purplish-red" methamphetamine mixture.

The third step is called the "cleanup," which can be broken down into two stages. First the red phosphorus is extracted by diluting the cooked mixture and pouring it through a filter. Then a strong base solution and an organic solvent are added. The impurities dissolve in the base and the methamphetamine dissolves in the solvent, resulting in a visible two-layered liquid. The base level is poured off, leaving the solvent level, and the end result is liquid methamphetamine.

The fourth and final step is to convert the liquid methamphetamine into a more pure solid product. This is accomplished by adding hydrochloric gas and boiling away the remaining solvent. The finished product is then filtered to eliminate any colored impurities.

Skowronski testified that sample one of the five liquid samples taken from the garage was a liquid containing methamphetamine dissolved in an organic solvent, indicating to him that the liquid was at the end of step three or before evaporation in step four of the production process. The other four liquid samples were strong basic solutions that Skowronski testified were consistent with the by-product produced in step three.

Skowronski also testified about his testing of the contents of the four plastic bags containing filters with damp reddish residue. One of the bags did not contain enough material for testing. Two of the bags contained filters with red phosphorus and trace amounts of methamphetamine. The last bag contained filters testing positive for red phosphorus, but not methamphetamine.

Finally, Skowronski testified about his testing of the coffee filters seized from the truck. Based upon his estimate of the amount of ephedrine that had been processed through the filters, Skowronski presented an opinion that the laboratory in the garage was capable of producing 100 to 200 grams of methamphetamine. To arrive at this estimate, Skowronski made several assumptions.

Skowronski first counted 42 coffee filters and noticed that some of the filters contained trace amounts of a white residue. Without actually counting how many filters contained residue, he "guesstimate[d]" that approximately two-thirds of the filters contained some white residue. Skowronski tested one of the filters and found ephedrine hydrochloride. But he did not individually test each of the remaining filters, even though he testified that by using visual examination alone, it was impossible for him to ascertain what the residue on each filter was. Instead, he scraped what white residue he could from all of the filters containing residue, ground the scrapings into a powder, and performed gas chromatography and spectrophotometry tests on the combined sample. Skowronski testified that "I presumed that when I did

the mixture that I would just have ephedrine hydrochloride."

The tests revealed that while 80–95 percent of the residue was ephedrine hydrochloride, there were also small amounts of methamphetamine in the mixture. Based on this result, Skowronski opined that most of the filters were used in step one to extract the ephedrine from the over-the-counter product, while one or two of the filters most likely contained traces of filtered methamphetamine from step four. Relying on his assumption that approximately two of the filters with residue had been used to process methamphetamine rather than to extract ephedrine, Skowronski then estimated that 22 coffee filters were used to process ephedrine hydrochloride.

Skowronski then testified that an individual manufacturing methamphetamine could use the type of coffee filter found in Traxler's truck in step one of the process in different ways, but "guesstimated the way you would normally use it, from about one-third full to two-thirds full." Acting on this assumption, Skowronski filled a sample filter about one-third full with ephedrine hydrochloride and then repeated the experiment filling a sample filter about two-thirds full. He determined that if the filters were originally one-third to two-thirds full with ephedrine hydrochloride, it would require five to ten grams of ephedrine for each filter. Assuming that 22 filters had each been filled with five to ten grams of ephedrine hydrochloride, Skowronski calculated that the 22 filters had been used to process between 110 to 220 grams of ephedrine hydrochloride. To convert the ephedrine hydrochloride to methamphetamine, Skowronski used the standard conversion factor of .92. Based on these calculations, Skowronski testified that the garage laboratory was capable of producing between 100 to 200 grams of methamphetamine.

In addition to Skowronski, the state called three other witnesses. The state called undercover narcotics investigator Roger Roatch to testify about his surveillance, DEA Agent Richard Ripley to testify about the items recovered from the search of Traxler's garage, and Susan Lane, owner of Biomedical Engineering Company, to testify about Traxler's purchases of iodine, a key ingredient for production of methamphetamine, from her company on several occasions, including the day before the arrest.

Traxler did not testify, but he called two witnesses in his defense. He called the person who subleased the garage space to him, who testified that he never saw Traxler manufacture, sell, or distribute drugs. Traxler also called a person who rented space in a garage stall next to him, who testified that he never saw Traxler making or selling drugs.

At the end of the trial, the court instructed the jury on first-degree and fifth-degree controlled substance crime in violation of Minn. Stat. § 152.021, subd. 1(3) and § 152.025, subd. 2(1). Minnesota Statutes section 152.021, subd. 1(3) provides that an individual is guilty of a controlled substance crime in the first degree if: "on one or more occasions within a 90–day period the person unlawfully sells one or more mixtures of a total weight of 50 grams or more containing methamphetamine." On this offense, the court instructed the jury that "whoever unlawfully possesses with the intent to manufacture on one or more occasions within a 90–day period one or more mixtures of a total weight of 50 grams or more containing methamphetamine is guilty of a controlled substance crime in the first degree." Minnesota Statutes section 152.025, subd. 2(1) makes it a crime to possess methamphetamine, but does not require the state to prove a specific weight or time period as separate elements of the offense. The jury returned a verdict, finding Traxler guilty on both counts.

The district court denied defense counsel's post-trial motions for judgment of acquittal or, in the alternative, a new trial. The court then sentenced Traxler to 86 months in prison for the first-degree offense. Traxler appealed his conviction to the court of appeals, arguing that the state's evidence was insufficient to prove that he violated § 152.021, subd. 1(3) by selling 50 grams or more of methamphetamine within a 90–day period. The court of appeals reversed. Relying on this court's decision in *State v. Robinson*, the court of appeals concluded that the circumstantial evidence was insufficient to prove weight—one of the required elements of the

first-degree offense. *See State v. Robinson,* 517 N.W.2d 336 (Minn.1994). We granted the state's petition for review and requested the parties to brief the following issues: (1) the correctness of the district court's instructions as to the elements of the offense, (2) the applicability of our decision in *State v. Robinson,* and (3) the appropriateness of the court of appeals' remedy.

I.

▮▮▮ We first address whether the district court's jury instructions on the elements of both the first-degree and the lesser-included fifth-degree offenses were erroneous. District courts possess considerable latitude to select the language of the jury charge. *State v. Gray,* 456 N.W.2d 251, 258 (Minn. 1990). Although the specific language of jury instructions may vary from case to case, they may not materially misstate the law. *State v. Pendleton,* 567 N.W.2d 265, 269 (Minn.1997).

The district court instructed the jury on first-degree controlled substance crime under Minn.Stat. § 152.021, subd. 3(1). This statute makes it a crime if "on one or more occasions within a 90–day period the person unlawfully *sells* one or more mixtures of a total weight of 50 grams or more containing methamphetamine." (Emphasis added.)

In the context of controlled substance crimes, "sell" is defined to mean:

(1) to sell, give away, barter, deliver, exchange, distribute or dispose of to another, or to manufacture; or

(2) to offer or agree to perform an act listed in clause (1); or

to possess with intent to perform an act listed in clause (1).

Minn.Stat. § 152.01, subd. 15a.

Normally, in order to tailor the jury instructions to the particular offense and the factual context with which a defendant is charged, the district court must replace individual terms in the controlled substance crime statutes with other definitional phrases. Before jury instructions were given in this case, defense counsel urged the court to replace "sell" in § 152.021, subd. 1(3) simply with "manufacture." The court instead replaced "sell" with the phrase "possess[ ] with the intent to manufacture" taken from § 152.01, subd. 15a (3), and instructed the jury on first-degree controlled substance crime as follows: "whoever unlawfully possesses with the intent to manufacture on one or more occasion within a 90–day period one or more mixtures of a total weight of 50 grams or more containing methamphetamine is guilty of a controlled substance crime in the first degree." The court also instructed the jury on the elements of the lesser-included offense, fifth-degree controlled substance crime, as follows: "whoever unlawfully possesses with the intent to manufacture one or more mixtures containing methamphetamine is guilty of a controlled substance crime in the fifth degree."

The state maintains that the legislature was clear and unambiguous in Minn.Stat. § 152.01, subd. 15a that one of the definitions of "sell" is "possess with intent to manufacture," and that therefore possession of the ingredients of methamphetamine meets the statutory definition of "sell." Traxler concedes that the definition of "sell" includes "possession with intent to manufacture." But Traxler argues that, because an individual cannot possibly possess that which is not yet made, "possession with intent to manufacture" cannot describe a criminal offense when "manufacture" is defined as "making" or "producing" rather than cultivating or packaging a pre-existing controlled substance.

▮▮▮ While we recognize that the statute certainly could have been more artfully drafted, we conclude that the district court's instructions, which included "possession with intent to manufacture" as one of the definitions of "sell," did not materially misstate the law. In so holding, we reject the notion that "possess" refers simply to the precursor ingredients of methamphetamine. Possession of the precursor ingredients such as ephedrine, iodine, and other necessary chemicals to manufacture methamphetamine is not enough to sustain a criminal charge of possession with intent to manufacture. To prove a charge of possession with intent to manufacture, the state must show that the defendant possessed "one or more mixtures

\* \* \* containing methamphetamine." Here there was evidence that one of the representative liquid samples contained some methamphetamine, albeit not in a pure form that was ready for sale, as did some of the coffee filters seized from Traxler's truck and garage. Accordingly, the district court's instructions to the jury were not erroneous.

## II.

■ We next turn to the sufficiency of the evidence. Traxler contends that the state's evidence on the first-degree offense was insufficient to prove both that he manufactured 50 grams or more of methamphetamine and that he did so within 90 days. In support of his position, Traxler cites to our recent decision in *State v. Robinson*, contending that *Robinson* should be read broadly to prohibit the state from proving weight of controlled substances through unscientific procedures and assumptions. The state argues that Skowronski's testimony and the items found in Traxler's truck and garage are sufficient to uphold Traxler's first-degree conviction and that *Robinson* is not applicable to these facts. A conviction based on circumstantial evidence, such as the evidence in this case, will be upheld "so long as a detailed review of the record indicates that the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995).

While we agree that our decision in *Robinson* was concerned about the use of reliable scientific techniques to prove weight, we do not believe that *Robinson* is specifically applicable here. In *Robinson*, we reversed the defendant's conviction for selling 10 grams or more of a cocaine mixture because the state failed to establish the weight of the mixture beyond a reasonable doubt. 517 N.W.2d at 337. The police in *Robinson* seized 13 clear plastic bags, each of which contained a piece of a white substance. *Id.* at 338. At trial, the chemist testified that she tested samples of the white substance from 6 or 7 of the 13 bags—less than 10 grams of the substance seized—and determined that the substance was 87.6 percent cocaine base. *Id.* The

chemist also testified that it was acceptable in the scientific community to accept a sampling of 10 percent of a substance as reliable to ascertain the nature of the entire substance. *Id.* We held that random testing under these circumstances was insufficient to establish beyond a reasonable doubt that the defendant possessed the required weight of the controlled substance. *Id.* at 339.

■ *Robinson* does not, however, preclude the state from establishing the weight of a mixture through extrapolation from random samples in every controlled substance case. Indeed, we specifically noted in *Robinson* that there may be instances when the controlled substance seized is such that extrapolation of weight through random testing would be legitimate, depending upon the composition and form of the substance, the type of substance involved, and the circumstances in which the substance is found or seized. *Id.* at 340.

However, in cases when extrapolation is acceptable, the methods or procedures used must be reliable. In the case at hand, Skowronski's testimony is insufficient to prove that Traxler manufactured 50 grams or more of methamphetamine. Skowronski's testimony is rife with "guesstimations" and assumptions. He did not individually count the filters that contained residue. Instead, he estimated that about two-thirds of the filters contained residue and assumed that all the residue was ephedrine, with no apparent scientific rationale, but then testified that different kinds of residue cannot be visually distinguished. When testing showed that some of the filters contained traces of methamphetamine, Skowronski then changed his original estimate of the number of filters used to process ephedrine from "about 2/3" of the 42 filters to 22 filters. Finally, he based his calculations on the assumptions that Traxler used only one filter at a time when cleaning the mixture and that Traxler only filtered the mixture once, even though according to Skowronski's own testimony, ephedrine extraction in step one often involves more than one filtering process.

If any of Skowronski's initial estimates or assumptions were faulty, his subsequent calculations would grossly overstate the total

amount of methamphetamine Traxler manufactured. While the state's evidence shows that Traxler could have manufactured 50 grams or more of methamphetamine, it is also entirely consistent with the rational hypothesis that Traxler actually manufactured less than 50 grams of methamphetamine. Accordingly, we hold that the state's evidence was insufficient to establish the element of weight—50 grams—beyond a reasonable doubt.

Moreover, the evidence was insufficient to establish another element of the offense—that Traxler manufactured the methamphetamine within the 90–day time period. While the trial judge specifically relied upon the fact that some of the filter papers were damp as sufficient evidence that the manufacturing process was recent, testimony at trial indicates that the damp filters were not among the 42 or 43 filters found in Traxler's truck upon which Skowronski based his weight estimate. Rather, the damp filters were the reddish filters in the four plastic bags seized from the garage. Further, on cross-examination, Skowronski acknowledged that he did not know when the filter papers found in Traxler's truck had been used:

Q: You don't know when those filter papers were theoretically used; isn't that correct?

A: Correct.

* * *

Q: You don't know how old those filter papers were or how long they had been in that form; isn't that correct?

A: Yes.

DEA Agent Ripley also acknowledged that he could not say with any degree of certainty when the production process had been completed. On the basis of this evidence, the state failed to prove beyond a reasonable doubt that Traxler manufactured the methamphetamine within the 90–day time period.

■ Because we conclude that the state failed to prove beyond a reasonable doubt two elements of the offense, that Traxler manufactured 50 grams or more of methamphetamine within a 90–day period, we reverse Traxler's first-degree controlled substance sale conviction. However, the district court also submitted to the jury the lesser-included offense of fifth-degree controlled substance crime, which does not require the state to prove a specific weight or time period as separate elements of the offense. *See* Minn.Stat. § 152.025, subd. 2(1) (providing that an individual is guilty of a controlled substance crime in the fifth degree if the individual unlawfully possesses one or more mixtures containing methamphetamine). The state presented evidence that one of the sample liquids tested positive for methamphetamine and that trace amounts of methamphetamine were found on the coffee filters from the garage and Traxler's truck. The jury returned a guilty verdict on the lesser-included offense as well. We conclude that the evidence is sufficient to prove that Traxler possessed methamphetamine in violation of Minn.Stat. § 152.025, subd. 2(1). Accordingly, we remand for resentencing of Traxler on the lesser-included fifth-degree offense of possession of methamphetamine.

Affirmed in part and remanded.