**STATE of Minnesota, Respondent,**

v.

**Dameon Deshay GATSON, Appellant.**

**No. A10–0247.**

Supreme Court of Minnesota.

Aug. 3, 2011.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

On July 5, 2007, appellant Dameon Deshay Gatson was indicted for first-degree murder, second-degree murder, and first-degree assault, pursuant to Minn. Stat. §§ 609.185(a)(1), 609.19, subd. 1(1), and 609.221, subd. 1 (2010), respectively. On October 30, 2009, a jury found Gatson guilty on all three counts. The trial court denied Gatson's motion for a new trial, convicted him of first-degree premeditated murder and first-degree assault, and sentenced him to life in prison without the possibility of release for the murder conviction and to a concurrent 86–month term for the first-degree assault conviction. In this direct appeal, Gatson raises the following issues: (1) whether the trial court erred when it found that the State's asserted reason for striking a prospective juror was not a pretext for purposeful discrimination; (2) whether the State failed to prove beyond a reasonable doubt that Gatson knowingly and intentionally aided another in committing the assault and the intentional killing of a human being; (3) whether the trial court erred when it failed to instruct the jury sua sponte on whether the homicide victim was a "human being" and whether the removal of the victim's life support was a superseding intervening cause for purposes of Minn.Stat. §§ 609.185(a)(1) and 609.19, subd. 1(1); (4) whether the trial court erred when it denied Gatson's request to instruct the jury on attempted murder and first-degree assault as lesser-included offenses of the first-degree murder charge; (5) whether the trial court's decision to admit portions of Gatson's accomplice's guilty plea violat-

ed Gatson's right to confrontation and our hearsay rules; (6) whether Gatson was denied a fair trial due to the State's opening statements regarding his accomplice's testimony; and (7) whether the trial court erred when it denied Gatson's motion for a new trial based on newly discovered evidence. For the reasons discussed below, we affirm Gatson's convictions.

On April 21, 2007, Shyloe Linde was at her friend's apartment in St. Louis Park. At that time, Linde was six months pregnant with Gatson's baby. Shortly before 11 a.m. that morning, a young, African–American man wearing a light blue sweatshirt knocked on the door of the apartment asking to speak with Linde. Linde did not recognize the man and refused to speak with him, but the man persisted and Linde eventually agreed to talk to him. After she stepped into the hallway, the man punched Linde in the stomach two times and ran away. Linde immediately began having contractions.

Linde was taken to Hennepin County Medical Center where doctors performed an emergency caesarean section to deliver the baby. The baby, who was named Destiny Gatson, weighed just under two pounds, was placed on life support, and had numerous medical procedures over the next nine days in an effort to save her life. During those nine days, Destiny's condition deteriorated and her doctors ultimately recommended removing her life support. Destiny's life support was removed on May 1, 2007, and she died soon after.

During their initial investigation, the police talked to a witness who, at around the time Linde was assaulted, was at a gas station near the apartment where the assault on Linde took place. The witness reported seeing a young, African–American male wearing a light blue sweatshirt run from around a wall near where the witness was standing. According to the witness, the man yelled, "I did it; let's go; let's go," then jumped into a vehicle driven by another man. The vehicle then sped away. The driver of the vehicle was later identified as Gatson. Further investigation revealed that the man in the light blue sweatshirt was Paul Petersen and that the vehicle was a Chevy Lumina owned by a friend of Gatson's. When interviewed by the police, Gatson initially denied knowing Petersen. Later, however, Gatson not only admitted that he knew Petersen, he also admitted that on the day of the assault he drove Petersen to and from the apartment where Linde was assaulted.

Gatson was ultimately arrested and indicted for first-degree premeditated murder and second-degree murder for aiding Petersen in the killing of Destiny and first-degree assault for aiding Petersen in the assault on Linde. At trial, the State presented evidence that Gatson fabricated an alibi as to his whereabouts before and during the time of the assault on Linde, that Gatson called Linde shortly before the assault and learned she was at her friend's apartment, that Gatson drove Petersen to and from the friend's apartment on the day of the assault, that Gatson sent Petersen up to the apartment to see Linde at the time of the assault, that shortly after the assault occurred, Petersen ran toward a vehicle yelling, "I did it; let's go; let's go," that Petersen got into the vehicle, and that Gatson drove that vehicle away at a high rate of speed. In addition, a portion of the transcript of Petersen's guilty plea hearing was read at Gatson's trial, through which the jury learned that Petersen admitted being friends with Gatson and that Petersen punched Linde with the intent to kill Linde's unborn child. The transcript of Petersen's guilty plea hearing was read into the record after the trial court determined that Gatson had procured a man named Rashad Arthur Raleigh to threaten

Petersen from testifying against Gatson, and that Gatson had therefore forfeited his right to confrontation. In making its determination, the trial court considered Petersen's testimony that, as a result of Gatson's efforts, Petersen had almost been stabbed three times while incarcerated at the Minnesota Correctional Facility in St. Cloud (MCF–St.Cloud), that Raleigh had threatened Petersen while they were both incarcerated at MCF–St. Cloud, and that people had been shooting outside of and at his mother's house.

After the jury found Gatson guilty, Gatson made a timely motion for a new trial claiming that his right to confrontation and his right to a fair trial were violated, that statements made by the State in its opening and closing arguments were improper and prejudicial, and that newly discovered evidence entitled him to a new trial. The trial court denied the motion and sentenced Gatson as previously noted. This appeal followed.

## I.

 We first address Gatson's argument that the trial court erred when it found that the State's asserted reason for striking a prospective juror, R.R., was not a pretext for purposeful discrimination. The exclusion of a person from a jury based solely on the person's race is prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State v. Greenleaf,* 591 N.W.2d 488, 500 (Minn.1999) (citing *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). To determine whether a peremptory strike was discriminatory, we apply the three-part test articulated by the Supreme Court in *Batson. Greenleaf,* 591 N.W.2d at 500. That test requires that the defendant first make a prima facie showing that the strike of the prospective juror was made on the basis of race. *Id.* If a prima facie showing is made, the burden then shifts to the State to articulate a race-neutral reason for the strike. *Id.* At this second step, the focus of the inquiry is on the facial validity of the explanation; therefore, the prosecutor's reason will be deemed race-neutral unless discriminatory intent is inherent. *Id.* Finally, at the third step, if the State has established a race-neutral reason for the strike, the trial court must determine whether the reason given was a pretext for purposeful discrimination. *Id.* In doing so, the trial court may take into consideration whether the State's strike will result in the disproportionate exclusion of members of a certain race. *Id.* Reviewing courts give considerable deference to the trial court's findings because a determination of intent is based in large part on the trial court's evaluation of credibility. *Id.* If it is ultimately determined that the reason given for striking the prospective juror was a pretext for purposeful discrimination, the defendant is automatically entitled to a new trial. *Id.*

Prospective juror R.R. was an African-American male. At the time the State struck R.R., the parties had already seated six women, including three women of color and two men. During the State's examination of R.R., the following discussion took place:

Q. Tell me about your friend in Atlanta. You had a friend who—who apparently shot somebody with a—a handgun?

A. Yeah.

. . . .

Q. Okay. Was this a close friend of yours?

A. Yeah, we grew up together.

Q. Okay. How long ago did this happen?

A. I think it happened in '06, maybe '07. And I know at his trial—No,

I'm—I believe it happened in '05, and then, the trial ended in '06.

Q. Did you follow that trial?

A. No.

Q. Did you read newspaper articles or—

A. No.

Q. How did you know that he was defending himself when he shot the person?

A. Well, I went for—for one day. I went to the—the trial. I sat in—in the back and was listening to the attorneys present their case, and they showed pictures that day.

. . . .

Q. Did you have a chance to speak with [your friend] at all?

A. No.

. . . .

Q. Never talked about this case when he served a year and a half in jail?

A. No, not . . . one time. And we talk[ed] about other things, but I didn't really bring up the case and everything.

The State subsequently struck R.R. and defense counsel made a *Batson* challenge. Defense counsel argued that there were only two African–American males in the jury pool and, before R.R., the State had already struck the other African–American male. On this basis, the trial court determined Gatson had made a prima facie showing of discriminatory intent. The State responded that its race-neutral reason for the strike was that R.R. was not "forthright" in his answers concerning his friend's trial. In particular, the State was concerned that R.R. said he did not follow his friend's trial, but then later admitted that he attended the trial. In concluding that the State's reason was not a pretext for purposeful discrimination, the trial court explained:

I'm persuaded that the reason articulated by the State is, in fact, race-neutral. I was somewhat troubled by his answer that he didn't follow the trial, and then, when the—further questioning he indicated that he actually attended the trial. . . .

To say that you're not following a trial, and then, subsequently say, Well, I wasn't following it but I did go to it, it seems to me that you kind of have to follow a trial to—in order to attend a rather significant event in the trial, and it appears that's what he actually did.

. . . .

. . . I find that he wasn't completely forthright in disclosing his involvement, and so, ultimately, I'm led to the conclusion that the prosecutor's race-neutral reason is not a pretext for something else and to ultimately deny the defense's *Batson* challenge.

The trial judge excused R.R. and subsequently stated:

[T]he reason I find that the reason asserted was not a pretext for race is that there was a very real concern on my part that [R.R.] would identify with the defendant because he appeared to be identifying with his friend's plight to the extent that he wasn't being completely honest with the Court and counsel about the circumstances of that incident and his involvement and would note that he acknowledged on the stand that he identified with the defendant. I think he actually said that he kind of prejudged the defendant, that he assumed that his situation and the situation of the defendant were the same and then really couldn't identify how they were the same.

Gatson does not take issue with the trial court's application of the first two steps of the *Batson* test. Rather, Gatson's argu-

ment is that in determining whether there was purposeful discrimination at the third step, the trial court erred by substituting its own reason for the State's reason. *See Miller–El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."). Specifically, Gatson argues that the trial court's statement that "there was a very real concern on my part that [R.R.] would identify with the defendant" demonstrates that the trial court improperly relied on its own reasoning and not that of the State. We disagree.

■ When considered in isolation, the trial court's comment that "there was a very real concern on my part that [R.R.] would identify with the defendant" might be read as the court's personal view as to why R.R. should have been stricken. A trial court is not, however, required to consider the State's reason for the strike in a vacuum: as the Court said in *Miller–El*, "[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." 545 U.S. at 251–52, 125 S.Ct. 2317. On the record here, when the trial court's comment is viewed in context with the trial court's entire assessment of the State's strike of R.R., it is clear that in making the comment about which Gatson now complains, the trial court was merely commenting on the "plausibility of [the State's] reason" for the strike. In other words, the comment explained why the court agreed with the State that R.R. was not being completely forthright in his an-

swers. Moreover, we note that at the time the State struck R.R., the parties had already seated three jurors who were persons of color. Therefore, we conclude that the trial court did not err when it upheld the State's strike of R.R.

## II.

■ Next, we consider Gatson's argument that the State failed to prove beyond a reasonable doubt that he knowingly and intentionally aided Petersen in the assault on Linde and the killing of Destiny. When reviewing a claim of insufficient evidence, our review of the evidence is to determine "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992). The verdict will be upheld if, "giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, [the jury] could reasonably have found the defendant guilty." *State v. Pierson*, 530 N.W.2d 784, 787 (Minn.1995). We consider the evidence in the light most favorable to the verdict and assume that the jury disbelieved any evidence conflicting with the result reached. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984).

■ In our analysis, we give circumstantial evidence heightened scrutiny. *State v. Bolstad*, 686 N.W.2d 531, 539 (Minn.2004). In doing so, we consider "whether the reasonable inferences that can be drawn from the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than ... guilt." *State v. Andersen*, 784 N.W.2d 320, 331 (Minn.2010). Thus, the circumstances proved must "be consistent with the hypothesis that the accused is guilty and inconsistent with any other ra-

tional hypothesis except that of guilt." *State v. Bias,* 419 N.W.2d 480, 484 (Minn. 1988). Circumstantial evidence must form a complete chain that, viewed as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt. *State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002).

With respect to circumstantial evidence, " 'our first task is to identify the circumstances proved.' " *Andersen,* 784 N.W.2d at 329 (quoting *State v. Stein,* 776 N.W.2d 709, 718 (Minn.2010) (plurality opinion)). In doing so, we " 'defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State.' " *Id.* (quoting *Stein,* 776 N.W.2d at 718). We recognize that the trier of fact is in the best position to determine credibility and weigh the evidence. *Moore,* 481 N.W.2d at 360; *see also State v. Hough,* 585 N.W.2d 393, 396 (Minn.1998) ("We review criminal bench trials the same as jury trials when determining whether the evidence is sufficient to sustain convictions."). However, we give no " 'deference to the [jury's] choice between reasonable inferences' " to be drawn from the circumstances proved. *Andersen,* 784 N.W.2d at 329–30 (quoting *Stein,* 776 N.W.2d at 716). Instead, we " 'examine independently the reasonableness of all inferences that might be drawn from the circumstances proved,' " including inferences consistent with rational hypotheses other than guilt. *Id.* at 329 (quoting *Stein,* 776 N.W.2d at 716). We "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). The State does not have the burden of removing all doubt, but of removing all reasonable doubt. *State v. Hughes,* 749 N.W.2d 307,

313 (Minn.2008). Therefore, in assessing the inferences drawn from the circumstances proved, it must be "true that there are no other reasonable, rational inferences that are inconsistent with guilt." *State v. Al–Naseer,* 788 N.W.2d 469, 474 (Minn.2010) (citation omitted) (internal quotation marks omitted).

### A.

Gatson first argues that the State failed to prove he was liable for Petersen's crimes beyond a reasonable doubt. "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1 (2010).

■■■ The evidence admitted at trial of Gatson's guilt of aiding Petersen is both substantial and compelling. The "circumstances proved" at trial include that Gatson fabricated an alibi as to his whereabouts before and during the time of the assault on Linde, that Gatson called Linde shortly before the assault and learned Linde was at a friend's apartment, that Gatson called Petersen shortly before and after the assault occurred, that Gatson drove Petersen to a gas station near the friend's apartment just before the assault, that Gatson sent Petersen up to the friend's apartment to see Linde at the time of the assault, that shortly after the assault occurred Petersen ran back to the waiting car at the gas station where he had been dropped off, that Petersen got into the car and yelled, "I did it; let's go; let's go," that Gatson then drove the car away at a high rate of speed, that Gatson had a pre-existing friendship with Petersen, and that Gatson initially lied to the police about his friendship with Petersen. This evidence leads us to the conclusion that the

only reasonable inference to be drawn is that Gatson intentionally aided Petersen in the assault on Linde and the killing of Destiny. Therefore, we also conclude that the evidence was sufficient to support the jury's guilty verdict.

### B.

Gatson next argues that the State failed to prove that Petersen caused the death of a "human being." To convict a person of first- or second-degree murder, the State must prove that the person caused the death of a "human being." Minn.Stat. §§ 609.185(a)(1) and 609.19, subd. 1(1). In *State v. Soto*, 378 N.W.2d 625 (Minn.1985), we noted that because Minnesota's homicide statutes do not provide a statutory definition of the term "human being," we would rely on the common law to construe the term. *Id.* at 628. We stated that

> [a]t common law it is clear that only a living human being could be the victim of a homicide. To become a human being within the meaning of homicide statutes at common law, a child had to be born alive and have an existence independent of and separate from its mother.

*Id.*

■ At trial, the State presented evidence that Destiny had a heartbeat when she was delivered. In addition, the State presented evidence that after Destiny was born, doctors performed CPR and chest compressions due to her low heart rate, that she was able to breathe with the assistance of a ventilator, that she lived independently and separately from her mother for nine days before her ventilator was removed, that the results of an initial ultrasound demonstrated bleeding into one part of her brain and that a second ultrasound taken two days later showed bleeding into both parts of her brain, and that she died shortly after she was removed from the ventilator.

Gatson argues that Destiny was not a "human being" for purposes of the homicide statutes because there was evidence presented at trial that "[Destiny] couldn't breath[e] on her own when she was born," that she required immediate CPR, that she "was never going to survive," that she "died" when her life support was removed because she was incapable of breathing on her own, and that the State presented no evidence that Destiny was born alive or was capable of having an independent and separate existence from her mother. Gatson's argument assumes, therefore, that the only way for the State to prove that Destiny was born alive was to prove that she was able to breathe without the support of artificial means. But our case law does not require a party to establish that a child have a minimum quality of life to prove the child was a human being. *See Soto*, 378 N.W.2d at 628 (requiring only that a child be born alive and "have an existence independent of and separate from" its mother). Our focus is on the *fact* of life, rather than the *quality* of life. *Id.*

Based on our case law, evidence of a child's ability to breathe without assistance is just one consideration in assessing whether a child is born alive for purposes of our homicide statutes. Although the record here lacks evidence that would establish that Destiny breathed on her own, there is evidence in the record establishing that both before and after delivery, Destiny had a heartbeat. There is also evidence in the record establishing that after delivery, Destiny went from bleeding into one part of her brain to both parts of her brain within a period of three days. Based on this evidence, we conclude that the jury could have reasonably concluded that Destiny was born alive. We also conclude that there was sufficient evidence for the jury

to have reasonably concluded that Destiny had an existence independent and separate from Linde. In addition to the evidence indicating that she was born alive, there is evidence that Destiny did not die until removed from life support nine days after she was delivered. Based on our conclusions that there was sufficient evidence to establish that Destiny was born alive and that she had an existence independent and separate from Linde, we also conclude that there was sufficient evidence to establish that Petersen caused the death of a human being.

## C.

■ Finally, Gatson argues that the State failed to prove causation. Specifically, Gatson argues that because Destiny died as a direct result of the decision to discontinue her life support, the termination and removal of life support constitutes a superseding intervening cause that relieves Petersen and therefore Gatson of criminal responsibility for Destiny's death. To prove that a defendant is guilty of causing the death of another, the State must prove the defendant's acts were a "substantial causal factor" leading to the death. *State v. Olson*, 435 N.W.2d 530, 534 (Minn.1989). In other words, "[i]t must be shown that the defendant's acts injured the [victim] which then led to the [victim's] death." *Id.* If the defendant seeks to establish a superseding cause, "the intervening conduct must be the sole cause of the end result." *Id.* In *Olson*, the defendant was charged with the death of a child who was put on a cardiopulmonary support system after suffering injuries caused when the defendant shook the child. *Id.* at 531. We held that the trial court properly ruled that the doctors' conduct in removing the child from the life support system was not a "superseding intervening cause" as a matter of law because medical intervention was a foresee-

able consequence of the defendant shaking the child. *Id.* at 534.

■ Despite Gatson's attempts to distinguish *Olson* from this case, we conclude that removal of Destiny's life support was not a superseding intervening cause of her death. Like the defendant's act of shaking the child that necessitated the medical intervention in *Olson*, Petersen's act of punching Linde in the abdomen caused the placental abruption leading to Destiny's premature birth and injuries requiring the medical intervention in this case. As was the case in *Olson*, the medical intervention here, including the removal of life support, was a foreseeable consequence of Petersen's assault of Linde. As a result, we conclude that the removal of life support was not a superseding intervening cause of Destiny's death. Therefore, we reject Gatson's argument that the State failed to prove causation.

## III.

We next address Gatson's argument that the trial court erred by not instructing the jury on whether Destiny was a "human being" for purposes of the homicide statutes and on whether the removal of Destiny's life support was a superseding intervening cause of her death.

## A.

First, Gatson argues that the trial court erred by not giving the jury an instruction regarding whether Destiny was a "human being" for purposes of the homicide statutes. This issue was not raised before the jury instructions were given at trial.

■ A party that fails to object to a jury instruction before the instruction is given is generally considered to have forfeited the right to appeal based on the instruction. Minn. R.Crim. P. 26.03, subd. 19(4)(a). However, an objection to an in-

struction may undergo appellate review if the instruction constitutes an error in fundamental law or controlling principle. Minn. R.Crim. P. 26.03, subd. 19(4)(f) ("Objections to instructions claiming error in fundamental law or controlling principle may be included in a motion for a new trial even if not raised before deliberations."). If the alleged error is one of fundamental law or controlling principle, any review will be for plain error. *See* Minn. R.Crim. P. 31.02; *State v. Vance*, 734 N.W.2d 650, 655 n. 3 (Minn.2007).

 District courts are given "considerable latitude" in selecting language for jury instructions. *Vance*, 734 N.W.2d at 656. When reviewing jury instructions for error, we review the instructions in their entirety to determine whether they fairly and adequately explain the law. *Id.* An instruction that materially misstates the law is erroneous. *Id.* In a criminal case, jury instructions must define the crime charged and explain the elements of the offense to the jury. *Id.*

Here, the trial court instructed the jury, in relevant part, as follows:

> Murder in the first degree, premeditation, defined. The statutes of Minnesota provide that whoever, with premeditation and with the intent to effect the death of the person or another, causes the death of a human being is guilty of a crime.

> Murder in the first degree, premeditation, elements. The elements of murder in the first degree are, first, the death of Destiny Gatson must be proven. Second, the defendant caused the death of Destiny Gatson, Third, the defendant acted with premeditation and with the intent to kill Destiny Gatson or another.

The trial court gave similar instructions for intentional second-degree murder and felony murder. All three instructions were based on the Minnesota Practice–

Jury Instruction Guides for criminal cases. *See* 10 Minn. Dist. Judge's Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 11.01–.02, 11.25–.26, 11.29–.30 (5th ed.2006). Based on the instructions given, we conclude that the trial court defined the crimes charged and explained the elements of the offenses to the jury.

 However, because Gatson argues that an issue exists as to whether Destiny was a "human being" for purposes of the homicide statutes, we must determine whether Gatson was entitled to an instruction defining "human being." A defendant is entitled to an instruction on his theory of the case if there is evidence to support it. *State v. Pendleton*, 567 N.W.2d 265, 270 (Minn.1997). Based on the record, it appears that Gatson's theory of the case at trial was that he did not procure Petersen to commit an assault and the intentional killing of Destiny. There is no indication, however, that Gatson's theory of the case was that Destiny was not a human being. Particularly revealing is Gatson's failure to request an instruction defining "human being" at trial. Therefore, Gatson essentially argues that the trial court should have given an instruction *sua sponte* defining "human being." We conclude that, without any indication that Gatson was challenging whether Destiny was a human being, the trial court had no obligation to sua sponte give an instruction on the definition of "human being." Therefore, the trial court did not err by failing to give such an instruction.

**B.**

 Second, Gatson argues that the trial court erred when it denied his request to include an instruction regarding whether the removal of Destiny's life support was a superseding intervening cause of Destiny's death. Alleged errors in jury

instructions are reviewed under the harmless error test. *Pendleton*, 567 N.W.2d at 270. An erroneous jury instruction is not harmless if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict. *Id.*

Unlike the instruction defining "human being," defense counsel requested that the trial court instruct the jury on superseding intervening causes. Therefore, we must first determine whether the trial court erred in refusing Gatson's requested instruction and, second, whether the trial court erred when giving the actual instruction. First, in determining whether the trial court erred in refusing Gatson's requested instruction, we must look to whether Gatson was entitled to an instruction on "superseding intervening cause" based on the evidence presented at trial. *See Pendleton*, 567 N.W.2d at 270. We have stated that "[t]o be a superseding cause, the intervening conduct must be the sole cause of the end result." *Olson*, 435 N.W.2d at 534. In *Olson*, we stated that the district court ruled correctly that removing the cardiopulmonary support system was not a superseding intervening cause as a matter of law because medical intervention was a foreseeable consequence of defendant shaking the child. *Id.* As we previously concluded, medical intervention in this case was also a foreseeable consequence of Petersen's assault of Linde. Further, Gatson failed to present evidence at trial that removing life support was a superseding intervening cause of Destiny's death because there was no evidence that the removal of life support was the sole cause of death. Therefore, we conclude that the trial court's refusal to instruct on whether the removal of Destiny's life support was a superseding intervening cause was not an error.

For similar reasons, we also conclude that the trial court did not err in its causation instruction to the jury. The trial court instructed the jury:

> Causation. The State must prove beyond a reasonable doubt that the defendant's acts had a substantial part in bringing about Destiny Gatson's death. It is not necessary that the defendant's acts be the sole cause of death so long as the defendant's acts start a [chain] of events which results in or substantially contributes to the death. And, further, if this chain of causation is found to exist, it is not broken by any treatment or lack of treatment administered to Destiny Gatson by the doctors in this case.

This instruction comes from the language in *Olson*, 435 N.W.2d at 534–35 n. 4, in which we recommended the same instruction be given on remand to the district court. Because we conclude that *Olson* fairly and adequately explains the law with regard to a superseding intervening cause, we conclude that the trial court's instruction to the jury was not an error.

### IV.

We next address Gatson's argument that the trial court erred when it denied Gatson's request to submit attempted murder and first-degree assault to the jury as lesser-included offenses of the first-degree murder charge. We review a district court's denial of a lesser-included offense instruction for an abuse of discretion. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn.2005). The failure to submit to the jury lesser-included offenses justified by the evidence requires reversal only if the defendant was prejudiced. *Id.* at 599.

Gatson argues that because first-degree assault is a lesser-included offense of first-degree murder, a rational jury could have acquitted Gatson of the murder charge and instead convicted him of at-

tempted murder and first-degree assault. Gatson's argument is based on his contention that the jury could have determined that the removal of Destiny's life support was a superseding intervening cause of her death. Given our earlier conclusion that the removal of Destiny's life support was not a superseding intervening cause of her death as a matter of law, we necessarily also conclude that any possible error in failing to give the requested instructions was harmless.

## V.

We next consider Gatson's argument that the trial court erred when it admitted portions of Petersen's guilty plea in violation of Gatson's right to confrontation and our hearsay rules.

## A.

▮▮▮▮ Gatson argues that the trial court erred by admitting portions of Petersen's guilty plea in violation of Gatson's right to confrontation guaranteed by the Sixth Amendment of the U.S. Constitution and article I, section 6, of the Minnesota Constitution.[1] Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a

clear abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). But whether the admission of hearsay evidence violates a defendant's rights under the Confrontation Clause is a question of law we review de novo. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn.2006). In order for the conviction to stand, we must conclude that a constitutional error is harmless beyond a reasonable doubt, meaning that the verdict rendered is "surely unattributable" to the error. *State v. Juarez*, 572 N.W.2d 286, 291–92 (Minn.1997).

▮▮▮▮ Here, the trial court concluded that Petersen's guilty plea was admissible under the forfeiture-by-wrongdoing exception.[2] But Gatson argues that Petersen's guilty plea does not fall under the forfeiture-by-wrongdoing exception because the State failed to prove that Petersen was unavailable and because the State failed to prove Gatson engaged in wrongful conduct that was intended to procure Petersen's absence. But even if we were to assume that Petersen's statements did not fall under the forfeiture-by-wrongdoing exception, we would conclude that any violation of Gatson's right to confrontation was harmless. Here, in addition to Petersen's statements, the State presented evidence

---

1. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Minnesota Constitution provides virtually the same language, *see* Minn. Const. art. I, § 6, and we have held that the Minnesota Constitution's right to confrontation should be interpreted identically to the Sixth Amendment's Confrontation Clause. *State v. Dukes*, 544 N.W.2d 13, 19 (Minn. 1996), *abrogated in part on other grounds by Dahlin*, 695 N.W.2d at 595–96.

2. Testimonial statements of witnesses absent from trial are admissible only if the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford*

*v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). But based on *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1879), and *Giles v. California*, 554 U.S. 353, 359, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), we recognized a narrow exception to a defendant's confrontation right, known as the "forfeiture-by-wrongdoing" exception. *State v. Cox*, 779 N.W.2d 844, 850–51 (Minn.2010). In order for this exception to apply, the State must prove, by a preponderance of the evidence: (1) that the declarant-witness is unavailable; (2) that the defendant engaged in wrongful conduct; (3) that the wrongful conduct procured the unavailability of the witness; and (4) that the defendant intended to procure the unavailability of the witness. *Id.* at 851–52.

that Gatson fabricated an alibi of his whereabouts before and during the time of the assault on Linde; that Gatson initially told police that he did not know who Petersen was; that Gatson called Linde shortly before the assault and learned she was at a friend's apartment; that Gatson drove Petersen to and from the friend's apartment the day of the assault; that Gatson sent Petersen up to the friend's apartment to see Linde at the time of the assault; that shortly after the time the assault on Linde occurred, Petersen ran toward a car yelling, "I did it; let's go; let's go"; and that Gatson drove this car away at a high rate of speed. Based on the overwhelming amount of evidence supporting Gatson's guilt, we conclude that the jury's verdict was surely unattributable to the trial court's error, if any, in admitting Petersen's guilty plea and therefore conclude that any error in admitting Petersen's testimony was harmless beyond a reasonable doubt.

### B.

■ Gatson also argues that the admission of Petersen's guilty plea violated our hearsay rules. Here, the trial court admitted portions of Petersen's guilty plea under the "declarations against penal interest" exception for unavailable witnesses. *See* Minn. R. Evid. 804(b)(3). Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Amos,* 658 N.W.2d at 203. Moreover, the court's evidentiary ruling will not be reversed unless the error substantially influenced the jury's verdict. *State v. Stone,* 784 N.W.2d 367, 370 (Minn.2010).

Hearsay is inadmissible unless an exception applies. Minn. R. Evid. 802. The Minnesota Rules of Evidence provide an exception to the hearsay rule for state-

ments made against a declarant's interest. Minn. R. Evid. 804(b)(3). This rule states:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Minn. R. Evid. 804(b).

■ Based on the Supreme Court's reasoning in *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), we have set forth a three-step analysis to determine whether a statement falls under the "declarations against penal interest" exception to the hearsay rules. *State v. Tovar,* 605 N.W.2d 717, 723 (Minn. 2000). First, the court must determine if the declarant was unavailable to testify. *Id.* Second, a court must determine that, at the time the statement was made and so far as it tends to subject the declarant to civil or criminal liability, "a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* Finally, the court must scrutinize the statements to ensure that their admission does not violate the Confrontation Clause. *Id.*

■ But even if we were to assume that Petersen's statements *did not fall* under the "declarations against penal inter-

est" exception to the hearsay rules, we would conclude that the trial court's ruling should not be reversed because the jury verdict was not substantially influenced by the error. Because this standard for reviewing evidentiary rulings is more lenient than the constitutional harmless error analysis previously conducted, we are satisfied that the trial court's error, if any, does not overcome the standard for "substantial influence." Therefore, Gatson is not entitled to any relief on his claim that the admission of Petersen's guilty plea violated our hearsay rules.

## VI.

■ We next consider Gatson's argument that he should be given a new trial because of the State's opening statements regarding Petersen's testimony. We review the trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Green*, 747 N.W.2d 912, 917 (Minn. 2008).

■ During a criminal trial, a prosecutor is allowed to "make an opening statement limited to the facts the prosecutor expects to prove." Minn. R.Crim. P. 26.03, subd. 12(c). A party objecting to opposing counsel's argument may seek a curative instruction. Minn. R.Crim. P. 26.03, subd. 12(*l*). We presume "that juries follow instructions given by the court," *State v. Matthews*, 779 N.W.2d 543, 550 (Minn.

2010), and thereby recognize the effectiveness of curative instructions. *State v. Swanson*, 307 Minn. 412, 422, 240 N.W.2d 822, 828 (1976); *see also State v. Brown*, 348 N.W.2d 743, 747 (Minn.1984) ("[C]arefully worded instructions by the trial court can ameliorate the effect of improper prosecutorial argument."), *abrogated in part by State v. Ramey*, 721 N.W.2d 294 (Minn. 2006). However, we have also recognized that curative instructions may not always have their intended effect. *See, e.g., State v. Caldwell*, 322 N.W.2d 574, 590–91 (Minn. 1982); *State v. Ramey*, 721 N.W.2d 294, 299 (Minn.2006).

Gatson argues that it was improper for the prosecutor to tell the jury in his opening statement that Petersen said Gatson paid him to assault Linde, that Petersen pled guilty to murder, and that Petersen would testify against Gatson at trial.[3] But Gatson has presented no evidence or argument suggesting that at the time of the opening statement the State did not intend to prove its statements through Petersen's testimony at trial. It was not until midtrial that the parties learned that Petersen would not testify and the trial court gave a curative instruction as to the State's opening statements regarding Petersen.

■ Nevertheless, Gatson argues that the curative instruction was not sufficient to cure the prejudice from the statements.[4]

---

3. In his opening statement, the prosecutor stated:

> Now, the other thing he'll tell you is the defendant actually gave him 40 bucks. He promised him 200, said he'll give him the rest later. He gave him about 40 bucks.
> . . . .
> . . . Paul Petersen has taken responsibility and removed any motive he had to fabricate. He came into a courtroom just like this on December 18, 2008, and pled guilty, pled guilty to the assault on Shyloe Linde and pled guilty to the murder of Baby Destiny.

Additionally, he agreed to come testify against the defendant. He's awaiting sentencing. In return for acknowledging his participation in this crime, he's going to receive a sentence of 480 months. . . . This guy has stepped up to the plate and acknowledged the obvious and accepted responsibility.

4. In giving the curative instruction, the trial court stated:

> In his opening statement, the prosecutor made reference to anticipated testimony of Paul Petersen. I have already instructed

**152**

In reviewing the portions of the opening statement challenged by Gatson, the only information that the jury heard from the State that they did not hear from other evidence presented at trial was the reference to Gatson's offer to pay Petersen for the assault. In light of all of the other evidence presented at trial, we are not convinced that the reference to Gatson's offer to pay Petersen denied Gatson a fair trial. *See State v. Jackson,* 773 N.W.2d 111, 122 (Minn.2009) (concluding that the prosecutor's questioning of witnesses was harmless beyond a reasonable doubt in light of the limited questions, curative instructions, and overwhelming evidence in support of the defendant's guilt). We therefore conclude that the trial court's denial of Gatson's motion for a new trial on this basis was not an abuse of discretion.

## VII.

Finally, we consider Gatson's argument that the trial court erred when it denied Gatson's motion for a new trial based on newly discovered evidence. A district court's decision to deny a new trial based on a claim of newly discovered evidence is reviewed for an abuse of discretion. *Race v. State,* 417 N.W.2d 264, 266 (Minn.1987). To obtain a new trial based on newly discovered evidence, the defendant must show:

> "(1) that the evidence was not known to the defendant or his/her counsel at the time of the trial; (2) that the evidence could not have been discovered through due diligence; (3) that the evidence is not cumulative, impeaching, or doubtful;

and (4) that the evidence would probably produce an acquittal or a more favorable result."

*Wright v. State,* 765 N.W.2d 85, 93–94 (Minn.2009) (quoting *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997)).

Gatson's motion for a new trial was based on newly discovered evidence that (1) the police had no records of Petersen's house being shot at,[5] (2) there had not been a stabbing at MCF–St. Cloud resulting in a criminal case since April 2006, and (3) Raleigh denied ever talking to Petersen about Gatson's case or having threatened him. Because the parties were alerted mid-trial of Petersen's refusal to testify, it is unlikely that the alleged newly discovered evidence was known to Gatson or his counsel. Furthermore, because the evidence was not relevant until Petersen's decision not to testify, it is unlikely that the evidence could have been discovered through due diligence.

Gatson's motion for a new trial, however, is essentially an argument that the newly discovered evidence would have persuaded the trial court not to admit Petersen's testimony at trial. Having already concluded that any error in the admission of Petersen's testimony was harmless, we are satisfied that the newly discovered evidence would not produce an acquittal or a more favorable result for Gatson. Accordingly, we conclude that any error in denying Gatson's motion for a new trial based on newly discovered evi-

---

you that what the attorneys say is not evidence and you are further instructed that any reference to anticipated testimony of Paul Petersen should not be considered by you in determining whether or not the State has proven its case beyond a reasonable doubt.

**5.** In support of Gatson's motion for a new trial, Gatson stated that "Mr. Petersen ... claimed that someone shot at his house. However, there is absolutely no evidence linking Mr. Gatson to this alleged occurrence." As noted earlier, however, Petersen testified that people had been shooting outside of and at his mother's home, not his own home.

dence did not result in any prejudice to Gatson.

Affirmed.

Timothy B. ALLEN, Appellant,

v.

BURNET REALTY, LLC, d/b/a
Coldwell Banker Burnet,
Respondent.

No. A09–1963.

Supreme Court of Minnesota.

Aug. 3, 2011.

Mark J. Briol, Morgan R. Smock, Briol & Associates, PLLC, Minneapolis, MN; Robert W. Biederman, Hubbard & Biederman LLP, Dallas, TX; and D. Ronald Reneker, Munsch Hardt Kopf & Harr, P.C., Dallas, TX, for appellant.

Wendy J. Wildung, Bruce Jones, Faegre & Benson LLP, Minneapolis, MN, for respondent.

Stanford P. Hill, Charles E. Lundberg, Jeffrey R. Mulder, Bassford Remele, P.A., Minneapolis, MN, for amicus curiae Edina Realty, Inc.

OPINION

ANDERSON, G. BARRY, Justice.

Appellant Timothy B. Allen asks us to decide whether contracts he signed while he worked as a sales associate for respondent Burnet Realty LLC were contracts of insurance as a matter of Minnesota law. Under the contracts, Allen and Burnet Re-

alty agreed to an allocation of expenses should a dispute arise related to Allen's work for Burnet Realty. In litigation commenced after he left Burnet Realty, Allen claimed that Burnet Realty violated Minn. Stat. § 60K.47 (2010) because the contracts were insurance, and as a result, Burnet Realty was required to be, but was not, "authorized to engage in the business of insurance" in Minnesota. Allen also claimed other relief on the basis that the contracts were insurance. The district court granted summary judgment in favor of Burnet Realty, concluding that the contracts were not contracts of insurance. The court of appeals affirmed. We affirm.

Allen was a licensed real estate salesperson and an independent contractor for Burnet Realty from 1999 through 2007. The parties' respective obligations and duties were set out in independent contractor agreements (ICAs) that Allen and Burnet Realty signed in each of the years at issue in this case. On the same days that Allen executed the ICAs, Allen also executed agreements to participate in Burnet Realty's Legal Administration Program (LA Program).

The LA Program was an agreement between Burnet Realty and its sales associates designed to "limit" a sales associate's "personal liability exposure" should an associate be "involved in a dispute or lawsuit." The LA Program applied to "Covered Disputes," which included "a dispute, arbitration proceeding, or lawsuit" initiated against the sales associate, Burnet Realty, or both. The dispute also had to "relate[ ] to" the sales associate's "actions which [were] contemplated within the scope of" the ICA between the sales associate and Burnet Realty. There were cer-

tain exceptions to the disputes that were covered by the LA Program, including when the associate engaged in intentional or reckless wrongdoing or fraud, or when the associate acted as a buyer or seller in a transaction. All sales associates were required to either join the program or obtain "company approved outside coverage."

When a covered dispute arose, the associate and Burnet Realty had different rights and obligations. The sales associate and Burnet Realty agreed to split all the legal expenses in connection with a covered dispute, which included errors-and-omissions insurance costs, attorney fees, and settlement costs. The sales associate and Burnet Realty split these expenses in the same proportion as the commissions the associate received. The LA Program capped the sales associate's liability at $1,500, and Burnet Realty was responsible for all expenses above that amount. The sales associate also had to cooperate with Burnet Realty in the defense of the dispute. Burnet Realty retained the ability to choose the attorney and retained the authority to make decisions on resolutions and settlements, but agreed to discuss resolutions and settlements with the sales associate. The LA Program also prohibited Burnet Realty from asserting any claims against the sales associate in connection with a covered dispute. The LA Program charged the sales associate an annual fee, which rose from $395 in 2002 to $450 in 2006.

About one year after leaving Burnet Realty, Allen commenced an action against the company, alleging that Burnet Realty (1) sold insurance through its LA Program in violation of Minn.Stat. § 60K.47 (2010); [1]

---

1. Section 60K.47 states that
 [a]ny person, whether or not licensed as an insurance producer, who participates in any manner in the sale of any insurance

 policy or certificate, or any other contract providing benefits, for or on behalf of any company that is required to be, but that is not authorized to engage in the business of

(2) violated the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70 (2010), by failing to inform sales associates that the indemnification program was an errors-and-omissions insurance policy; and (3) obtained unjust enrichment by selling unauthorized insurance and keeping the proceeds. Burnet Realty moved for summary judgment.

Before ruling on the summary judgment motion, the district court requested that the Minnesota Department of Commerce, which regulates both real estate and insurance, provide its view as to whether the LA Program constituted an unlawful insurance policy. The Commissioner of the Department concluded that the LA Program created a relationship that was "markedly different" from the typical insurer-insured relationship, and that the LA Program acted as "a self-insurance arrangement" that "would not be regulated under Minnesota's insurance laws."

gram was not insurance, Allen's section 60K.47 claim failed. The court also concluded that Allen's other claims failed because "those claims assume[d] that the LA Program was insurance that Burnet [Realty] was selling in violation of Section 60K.47."

---

insurance in this state, other than pursuant to sections 60A.195 to 60A.209, is personally liable for all premiums, whether earned or unearned, paid by the insured, and the premiums may be recovered by the insured.